UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| ALL ONE GOD FAITH, INC., *et al.*,<br><br>           Plaintiffs,<br><br>      v.<br><br>UNITED STATES,<br><br>           Defendant,<br><br>      and<br><br>CP KELCO U.S., INC.,<br><br>           Defendant-Intervenor. | Consol. Court No. 20-00164 |

**DEFENDANT'S RESPONSE TO THE COURT'S QUESTIONS**

Pursuant to the Court's letter dated February 2, 2022 (ECF no. 58), defendant, the United States, respectfully submits these written responses to the questions issued by the Court ahead of oral argument scheduled for February 15, 2022.

**Questions To Defendant The Government**

1. **Please respond to the Consolidated Plaintiffs' argument that 19 U.S.C. § 1517(b)(4) required CBP to refer a changed circumstances review to the U.S. Department of Commerce.**

The process described in 19 U.S.C. § 1517(b)(4) is not a changed circumstances review. Rather, it describes the process under which U.S. Customs and Border Protection (CBP) can stay statutory investigation deadlines while the Department of Commerce (Commerce) determines whether merchandise underlying an evasion allegation is subject to an existing order – similar to a "scope review" in antidumping and countervailing duty (AD/CVD) matters. Specifically, the

statute states that "[i]If the Commissioner receives an allegation under paragraph (2) and is unable to determine whether the merchandise at issue is covered merchandise, the Commissioner shall …refer the matter to the administering authority to determine whether the merchandise is covered merchandise…" 19 U.S.C. 1517(b)(4)(A). "Covered merchandise" is defined in the statute as "merchandise that is subject to— (A) an antidumping duty order issued under section 1673e of this title; or (B) a countervailing duty order issued under section 1671e of this title." 19 U.S.C. § 1517(a)(3).

But consolidated plaintiffs do not assert that the entries made do not fall under the existing xanthan gum order, but rather that the entire order should be rescinded because the domestic interested party, allegedly, "does not consistently supply the market in the United States with oilfield xanthan produced in the United States." ECF No. 27, 28, 29, 30 at 10. Thus, what consolidated plaintiffs appear to seek is a revocation of the entire order based on a finding that no domestic party produces xanthan gum. No provision in § 1517 provides for such a review.

Nor does *any provision* – in either § 1517, or the other regulations cited by consolidated plaintiffs – mandate that CBP affirmatively provide Commerce with information that it receives in the context of an evasion determination. The statute is clear that a "changed circumstances review" is commenced by *Commerce* after receiving a *request* for a review, not by CBP receiving vague assertions that a domestic party may not be producing the relevant product any longer. 19 U.S.C. § 1675(b)(1). CBP was under no requirement to conduct a changed circumstances review or request on behalf of the consolidated plaintiffs that Commerce conduct such a process.

**2. Please identify the record evidence that best supports CBP's conclusion that the box pictures provided by DBMS were not credible.**

As an initial matter, CBP did not make a determination that any individual photograph was or was not credible. Rather, it evaluated all of the evidence put on the record by DBMS to determine whether, as a whole, the evidence served to credibly establish that the entries DBMS entered were actually produced – not just in China – but by a Chinese entity subject to a 0.0% rate. CBP reasonably concluded that the photos of the boxes, along with the other information provided by DBMS, was not sufficient to establish the producer or initial distribution of the xanthan gum imported by DBMS.

First, DBMS made three entries of xanthan gum – each containing several crates – yet submitted pictures of only two crates. C.R. 95, 96. As CBP explained, the information on the crates appears to correspond to entry information for only *one of the three* entries made. C.R. 113 at 10. Thus, even if the photos were sufficient to establish the identity of the producer, they would do so for – at best – only one of the three entries. Second, the crates indicate that they were "imported and marketed" by Anshul Life Sciences, an Indian entity *not otherwise mentioned* in any of DBMS's entry documents or submissions to CBP. *See* C.R. 113 at 10-11 ("neither DBMS nor Sunatura appear to have identified that entity as the supplier of Sunatura or to have otherwise referenced that specific entity in their CF28 or RFI responses."). Third and finally, DBMS claimed that most of the product was shipped to a third party manufacturer upon entry into the country, but conceded that it had retained 50 3,000-pound cartons in California. C.R. 113 at 10. As CBP explained, if the cartons were so clearly marked "Country of Origin: China," it is confusing as to how DBMS ever believed the xanthan gum was of Indian origin, and why it did not correct the importation documentation once it took possession of the merchandise, instead staying silent until CBP opened its investigation.

The sum of all the evidence placed on the record – including the photographs – led to CBP's evasion determination, and that determination is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517 (g)(2)(B).

3. **You state that "while there has been little case law under EAPA to date, general legal principles applicable to anti-dumping and countervailable duties . . . should apply here, including that an importer is responsible for providing the requesting agency" with records and information relevant to the proceeding. Def.'s MtD at 27. Is there any statutory basis for the application of a similar standard and burden for importers participating in an EAPA investigation, and those participating in an anti-dumping or countervailable duty investigation?**

Defendant believes that it is appropriate for this Court to rely on AD/CVD decisions to the extent the legal or statutory principles parallel the matters before the Court. The EAPA statute appears in 19 U.S. Code Chapter 4 – the Tariff Act of 1930 – as do provisions setting forth the harmonized tariff schedule (§ 1202) and Commerce's processes for assigning Countervailing and Antidumping Duties (§§ 1671-1677n). Similarly, this Court's jurisdiction to consider EAPA matters is founded in the same provisions giving the Court subject matter jurisdiction over AD/CVD matters. *See* 28 U.S.C. § 1581(c) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930.)

Moreover, this Court has relied upon decisions from the United States Court of Appeals for the Federal Circuit analyzing antidumping and countervailing duty determinations in deciding the few cases under EAPA to be litigated to date. In *Royal Brush Manufacturing, Inc. v. United States*, this Court relied upon *PSC VSMPO-Avisma Corp. v. United States* for the proposition that "an importer participating in an administrative proceeding has a procedural due process right to 'notice and a meaningful opportunity to be heard…" *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294, 1305 (Ct. Int'l Trade 2020), quoting *PSC VSMPO-Avisma*

*Corp. v. United States*, 688 F.3d 751, 761–62 (Fed. Cir. 2012).  Similarly, that same decision also relied upon Federal Circuit cases reviewing AD/CVD determinations for the legal standard to apply in considering whether CBP's determination in that matter was arbitrary, capricious, or an abuse of discretion.  *Id.* at 1302 (*citing Consol. Bearings Co. v. United States,* 412 F.3d 1266, 1269 (Fed. Cir. 2005*), Wheatland Tube Co. v. United States,* 161 F.3d 1365, 1369 (Fed. Cir. 1998)).

Importantly, while the Court in *Royal Brush* rejected an argument advanced by CBP but relying on AD/CVD decisions from this Court, it did so not because those cases were *de facto* inapplicable, but rather because the principle agency position for which they were cited – the purpose of verification – was not reflected in CBP's determination or elsewhere in the administrative record.  *Id.* at 1303.  Indeed, the Court later cited to AD/CVD decisions for principles also applicable to the issue before the Court.  *Id.* at 1305 (citing *Transcom, Inc. v. United States*, 24 C.I.T. 1253, 1271, 121 F. Supp. 2d 690, 707 (2000) ("It is impossible to comprehend how an importer's lack of a vested right to import merchandise in the future negates the obligation to provide the importer with notice prior to imposing an antidumping duty for the merchandise already imported.")).

The principle for which our brief pointed to AD/CVD decisions is similarly fundamental: an importer must keep sufficient records demonstrating the origin of the products it seeks to import into the United States and be able to provide those documents to CBP upon request.  Def. Br. at 27.  This is not a principle only enunciated by Commerce to which we point the Court – CBP's regulations and practice make it clear that maintenance of adequate records is mandatory for importers:

> For example, under Section 484 of the Tariff Act, as amended (19 U.S.C. § 1484), the importer of record is responsible for using reasonable care to enter, classify and

determine the value of imported merchandise and to provide any other information necessary to enable CBP to properly assess duties, collect accurate statistics, and determine whether other applicable legal requirements, if any, have been met."

CBP's Reasonable Care Informed Compliance Publication, at Preface.

Moreover, under EAPA, CBP has the authority to collect "such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate."  19 U.S.C. § 1517.  Further, outside of EAPA, under 19 U.S.C. § 1508, importers must maintain, keep, and render for examination records related to import activity.  19 U.S.C. § 1508(a).  And under 19 USC 1509(a) importers are required to produce entry records when requested by CBP.  Indeed, importers who do not comply with recordkeeping and production requirements may be subject to penalties.  19 USC § 1509(g).

4. **Please respond to DBMS's argument that requesting "entitlement to a duty drawback" is meaningfully different from "defend[ing] . . . against the allegation of 'evasion' as defined under EAPA." Reply to Mot. for J. on the Agency R. and Resp. to Partial Mot. to Dismiss at 8, Sept. 1, 2021, ECF. No. 46 ("DBMS's Reply").**

There is no absolute right to enter foreign merchandise into the United States; rather, importers must comply with applicable law and pay applicable duties in order to do so.  We cited to certain cases for the basic proposition that it is DBMS – not CBP – that bears the burden of establishing the origin of its merchandise.  ECF No. 40 at 18-19.  This is not a requirement specific to "duty drawbacks" but rather is inherent in the entire statutory scheme permitting the importation of foreign-produced goods into the United States.  Under 19 U.S.C. §1484, a party qualifying as an "importer of record" must submit information as is necessary to enable CBP to properly assess duties to the merchandise and determine whether any other applicable requirement of law is met, including the classification and rate of duty applicable to the merchandise.  19 U.S.C. § 1484(a)(1)(B)(i)-(iii) (requiring an "importer of record" to furnish CBP with "such other documentation … as is necessary to enable the Customs Service to – (i)

properly assess duties on the merchandise, (ii) collect accurate statistics with respect to the merchandise, and (iii) determine whether any other applicable requirement of law (other than a requirement relating to release from customs custody) is met.")

The EAPA statute contains no language lifting this burden from an importer; thus, if DBMS believes it is entitled to receive a 0.0% rate on the entries it makes, it is DBMS's responsibility to provide enough documentation to establish entitlement to that rate. Indeed, requiring CBP to *affirmatively establish* that merchandise was or was not produced in a given location by a certain entity, rather than requiring an importer to establish where the merchandise it seeks to import comes from, would constitute a wholesale shift in customs enforcement, one not remotely contemplated by the EAPA statute. Here, DBMS concedes that the entry documents it filed – indicating that the xanthan gum was produced in India – were false, and that its xanthan gum was produced in China (where the countrywide rate is 154%), yet seeks to require CBP to establish that it was *not* produced by an entity subject to a 0.0% rate. The Court should reject DBMS's effort to shift its burden to CBP.

5. **DBMS argues that "CBP could have used an adverse inference against the interests of the Indian Supplier due to its lack of cooperation," but not against the interests of DBMS. DBMS's MJAR at 20. Is it your position that an importer may be subject to adverse inference regardless of its own efforts to cooperate with CBP's investigation, so long as its suppliers fail to cooperate?**

Yes. The statute is clear that an adverse inference may be applied against *either* "a person alleged to have entered such covered merchandise into the customs territory of the United States through evasion" *or* "a person that is a foreign producer or exporter of such covered merchandise." *See* 19 U.S.C. § 1517(c)(3)(B) (referring to §1517(c)(2)(A) (ii) and (iii)). The statute goes on to explain that an importer is not shielded from an adverse inference because they fully responded to all of the agency's requests but their foreign producer or exporter did not;

7

rather, CBP has the discretion to apply an adverse inference "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought by the Commissioner, such as import or export documentation." *Id.* The statute thus clearly contemplates that CBP can apply an adverse inference against a "foreign producer or exporter," and that an importer's compliance with CBP's request will not shield it from the effects of that non-compliance.

6. **Please respond to DBMS's assertion that, in the context of EAPA determinations, CBP has the authority to "reliquidate entries otherwise liquidated." DBMS's Reply at 6 n.5.**

CBP only has the authority to liquidate or reliquidate entries as provided for by law. The Interim Final Rule cited by DBMS provides that upon a finding of evasion, CBP will "take such additional enforcement measures as CBP deems appropriate, including (but not limited to) modifying CBP's procedures for identifying future evasion, [and] reliquidating entries as provided by law...." Investigation of Claims of Evasion of Antidumping and Countervailing Duties, 81 Fed. Reg. 56,477, 56,478 (August 22, 2016). Since EAPA does not provide specific reliquidation authority, this language contemplates that CBP will reliquidate entries in accordance with its existing authorities. Under 19 U.S.C. § 1501, CBP may reliquidate entries within ninety days from the date of the original liquidation. 19 U.S.C. § 1501. EAPA, on its own, does not provide CBP with any additional reliquidation authority.

Additionally, under 19 U.S.C. § 1514(a)(7), the liquidation or reliquidation of an entry, or reconciliation as to the issued contained therein, or any modification thereof, including the liquidation of an entry, is final and conclusive upon all persons unless a protest is filed or a civil action contesting the denial of a protest, in whole or in part, is commenced in this Court. There is no provision in EAPA to suggest that this finality is overridden by EAPA and, notably, DBMS

points to no legal authority – statutory or other – in support of its assertion.

7. **What cases and authorities best support your argument?**

The best authority to support our argument is the statute, 19 U.S.C. §1517, and regulations implementing the statute. The statute is the source of CBP's authority to conduct investigations and apply an adverse inference against a party other than the importer of record. The statute is also silent as to reliquidation authority, indicating that Congress did not intend to extend CBP's authority beyond that which already exists. The statute also provides the standard of review for the Court's analysis: "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1517(g)(2)(b).

8. **Are there any recent or pending Federal Circuit or CIT cases that may affect the court's analysis?**

Because litigation under EAPA is relatively new, there are few published decisions analyzing the statute. However, this Court has published four decisions in three matters: *Vietnam Finewood Co. Ltd. v. United States*, 466 F. Supp. 3d 1273 (Ct. Int'l Trade 2020); *Royal Brush Mfg., Inc. v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020); *Royal Brush Mfg., Inc. v. United States*, No. 19-00198, 2021 WL 5033650 (Ct. Int'l Trade Oct. 29, 2021); and *Diamond Tools Tech. LLC v. United States*, 2021 WL 5149856 (Ct. Int'l Trade Oct. 29, 2021). Additionally, while not entirely analogous, the currently pending *Ad Hoc Shrimp Trade Enforcement Committee v. United States* (Court No. 21-129) concerns the application of an adverse inference in the context of an EAPA investigation.

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | BRIAN M. BOYNTON<br>Acting Assistant Attorney General |
|  | PATRICIA M. MCCARTHY<br>Director |
|  | /s/ L. Misha Preheim<br>L. MISHA PREHEIM<br>Assistant Director |
| OF COUNSEL:<br>COREY CELT<br>Attorney<br>U.S. Customs and Border Protection<br>Office of the Chief Counsel | /s/ Kelly A. Krystyniak<br>KELLY A. KRYSTYNIAK<br>Trial Attorney<br>Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 480<br>Ben Franklin Station<br>Washington D.C. 20044<br>Tel: (202) 307-1063<br>Email: kelly.a.krystyniak@usdoj.gov |
| February 11, 2022 | *Attorneys for Defendant United States* |

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that this brief complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the brief was prepared, the public version of the brief contains a total of 2,922 words.

s/ Kelly A. Krystyniak

February 11, 2022